UNITED STATES of America,
Plaintiff-Appellee,

v.

Steven Michael WEHRLI,
Defendant-Appellant.

No. 80–5149.

United States Court of Appeals,
Fifth Circuit.
Unit B

Feb. 19, 1981.

Rehearing and Rehearing En Banc
Denied April 1, 1981.

Robert W. Knight, Federal Public Defender, H. Jay Stevens, Asst. Federal Public Defender, Orlando, Fla., for defendant-appellant.

Gary L. Betz, U. S. Atty., Tampa, Fla., Kendall W. Wherry, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before TUTTLE, GODBOLD and HILL, Circuit Judges.

JAMES C. HILL, Circuit Judge:

This case presents a single issue: what fourth amendment requirements, if any, circumscribe the search of a passenger's carry-on luggage when he presents himself at a boarding gate to enter an aircraft? Appellant Wehrli was convicted of possession of cocaine with intent to distribute. 21 U.S.C. § 841(a)(1). The critical evidence was produced from the search of his carry-on luggage. He seeks the suppression of this evidence. For the reasons set out below, we affirm its admission.

## I. The Search

On November 15, 1979, Wehrli presented himself at a security checkpoint in the Orlando International Airport. Signs posted throughout the airport indicated that a passenger's luggage would be subject to search at such a checkpoint. Record, Vol. II, at 23, 83. As his luggage passed through the security screening x-ray machine the attendant noticed three shapes that might have been cylinders with attached wiring. Record, Vol. II, at 18. The attendant, Mrs. Henry, had the bag set aside and informed Wehrli that it would have to be checked. She requested her superior, Mrs. Ellis, to conduct the search. Mrs. Ellis asked Wehrli to open a zippered compartment on his bag, which he did, removing two cloth rolls containing gold chains. Wehrli told Mrs. Ellis that this was apparently what the x-ray machine had seen.

Mrs. Ellis then asked Wehrli to open the other compartment on his bag. Wehrli responded that it only contained dirty laundry. Mrs. Ellis advised him that once a search was started the entire bag would have to be searched. Wehrli unzipped the compartment and Mrs. Ellis began her inspection. When she reached inside the bag Wehrli grabbed and restrained her wrist. Mrs. Ellis said she had to complete the

search. Wehrli let go of her wrist and she pulled a plastic bag from his luggage. A nearby DEA agent recognized the powder in the bag as cocaine. Wehrli was arrested.

The district court denied Wehrli's motion to suppress on two grounds. First, it held that when a passenger presents himself for boarding he has no expectation of privacy in the contents of his carry-on luggage. Second, it found that consent to search can be implied at an airport security checkpoint. Record, Vol. II, at 171–72.

## II. *The Search and the Fourth Amendment*

Wehrli argues that in order to conduct a physical inspection of his luggage the individual searching must have reasonable suspicion based upon articulable facts as required by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). He further contends that the only suspicion raised was as a result of the three cylinders being viewed through the x-ray machine. Thus he concludes that once a satisfactory explanation of those cylinders was given, which he asserts occurred when the gold chains were discovered, there was no longer any basis for suspicion, and hence, no basis for continuing the search of his luggage.

We find this argument to be unpersuasive in light of our opinion in *United States v. Skipwith*, 482 F.2d 1272 (5th Cir. 1973). In *Skipwith*, which also concerned a search at an airport boarding gate,[1] we recognized that the reasonableness of a warrantless search depends on balancing the need for the search against the "degree and nature of intrusion into the privacy of the person and effects of the citizen ..." *Id.*, at 1275.

The same factors which we balanced in approving the search in *Skipwith* provide the basis for our concluding that the search of Wehrli's carry-on luggage was not unreasonable under the fourth amendment.

Wehrli voluntarily presented himself at the boarding gate, "a place at which he knew or should have known he was subject to being searched." *Id.*, at 1273. "He had every opportunity to avoid the [searching] procedure by not entering the boarding area." *Id.*, at 1276. Furthermore, airport searches like the one in question are "less offensive" to fourth amendment interests because "there is [an] almost complete absence of any stigma attached to being subjected to search at a known, designated airport search point." *Id.*, at 1275. In addition, these searches are generally made under supervision "and not far from the scrutiny of the traveling public." *Id.*, at 1276. Hence, abuses are less likely. Moreover, the airlines, themselves, have a strong interest in seeing that their passengers are not "unnecessarily harassed." *Id.*

Against this limited intrusion we must balance the "bitter experience" of air piracy. *Id.*, at 1275. "An airplane in flight, despite all of its engineering sophistication, is a uniquely fragile and vulnerable target when a passenger or crewmember is threatened by a weapon or an explosive." *United States v. Bell*, 464 F.2d 667, 670 (2d Cir. 1972). As previously stated by this court:

> At the core of this problem is the hijacker himself. In some cases he is a deeply disturbed and highly unpredictable individual—a paranoid, suicidal schizophrenic with extreme tendencies towards violence. Although the crime of air piracy exceeds all others in terms of the potential for great and immediate harm to others its undesirable consequences are not limited to that fact. Among other things, it has been used as an avenue of escape for criminals, a means of extorting huge sums of money and as a device for carrying out numerous acts of political violence and terrorism ....
>
> Apart from the unusual dangers inherent in the crime itself, aerial hijacking has created equally unusual detection problems. Unlike most other crimes, hijacking is one in which secrecy is not a principal concern. Once the hijacker de-

---

1. As did the panel in *Skipwith*, we note a sharp distinction between a search conducted at an airport boarding gate and the search of certain persons in the general airport area. 482 F.2d at

1276. *See United States v. Moreno*, 475 F.2d 44 (5th Cir. 1973) (requiring reasonable suspicion to search a person in the general airport area.)

cides to act he doesn't care if there are numerous witnesses. Indeed, according to the pattern developed thus far, he prefers as many as possible because each one is a potential hostage to shield him from apprehension until he can be flown to a political sanctuary or place of concealment. Obviously, in order to jeopardize the lives and safety of the smallest number of people, the hijacker must be discovered when he is least dangerous to others and when he least expects confrontation with the police. In practical terms this means while he is still on the ground and before he has taken any overt action. *United States v. Moreno*, 475 F.2d 44, 48–49 (5th Cir. 1973), *quoted in*, La Fave, *Search and Seizure*, § 10.6, 329–30 (1978).

It is also important to our holding that Mrs. Ellis' search was reasonable in scope; it did not range beyond an area reasonably calculated to discover dangers to air safety. As we observed in *Skipwith*:

> The range and variety of devices real and simulated which can be used to intimidate the crew of an aircraft when it is aloft are almost limitless. The airport security officer has to be alert for all of them. Marshal Rodruguez was justified in undertaking a search with sufficient scope to reveal any object or instrumentality that Skipwith could reasonably have used to effect an act of air piracy.

482 F.2d at 1277. It was Mrs. Ellis' task to insure that Wehrli's bag was devoid of skyjacking weapons. Given the myriad of devices which threaten air safety, anything less than a thorough search of Wehrli's bag would have been dangerously incomplete.

In sum, as did the panel in *Skipwith*, we find ourselves in agreement with Judge Friendly:

> When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air.

*United States v. Skipwith*, 482 F.2d 1272, 1276 (5th Cir. 1973), *quoting, United States v. Bell*, 464 F.2d 667, 675 (2d Cir. 1972) (Friendly, J., concurring); *See United States v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974) (Friendly, J.).

When Mrs. Ellis extracted the plastic bag from Wehrli's luggage it was in plain view of the DEA agent. *Coolidge v. New Hampshire*, 403 U.S. 443, 464–473, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564 (1970). Accordingly, the cocaine was properly admitted and Wehrli's conviction is

AFFIRMED.